UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | |
| ANTHONY BASILICI, | * | Criminal Action No. 19-cr-10245-ADB |
| | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

**<u>MEMORANDUM AND ORDER</u>**

BURROUGHS, D.J.

On January 26, 2023, a jury found Anthony Basilici ("Basilici" or "Defendant") guilty of conspiring to possess with the intent to distribute heroin ("drug trafficking conspiracy") (Count One), possessing a firearm in furtherance of the drug trafficking conspiracy (Count Five),[1] conspiring to commit kidnapping (Count Nine), conspiring to obstruct justice by retaliating against a witness, victim, or informant (Count Ten), and obstructing justice by tampering with a witness, victim, or informant by physical force or threat and aiding and abetting the same conduct (Count Eleven).  [Verdict at 2–3].  Currently before the Court are Defendant's motions for acquittal as to Counts Five, Nine, and Ten, [ECF No. 862], and for a new trial, [ECF No. 872].  For the reasons set forth below, both motions, [ECF Nos. 862, 872], are <u>DENIED</u>.

---

[1] The jury found that the firearm was discharged.  [ECF No. 839 ("Verdict") at 2].

## I.     BACKGROUND

### A.     Relevant Procedural History

On July 17, 2019, eleven defendants, including Basilici, were charged by indictment with conspiring to distribute heroin and firearms offenses.  [ECF No. 49].  On March 11, 2020, a grand jury returned a superseding indictment, adding counts related to an alleged kidnapping in April 2019 and two additional defendants.  [ECF No. 124 ("Superseding Indictment")].

The Superseding Indictment charged Basilici with:

- One count of conspiring to distribute and to possess with intent to distribute 100 grams or more of heroin in violation of 21 U.S.C. § 846 (Count One);

- One count of possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(l)(A) and (c)(l)(A)(iii) (Count Five);

- One count of conspiring to commit kidnapping in violation of 18 U.S.C. § 1201(c) (Count Nine);

- One count of conspiring to obstruct justice by retaliating against a witness, victim, or informant in violation of 18 U.S.C. § 1513(f) (Count Ten); and

- One count of obstructing justice and aiding and abetting the obstruction of justice by tampering with a witness, victim, or informant by physical force or threat in violation of 18 U.S.C. § 1512(a)(2)(c) (Count Eleven).

See [Superseding Indictment at 2–3, 7, 11, 14].

On August 10, 2022, Basilici pled guilty to all five counts pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C).  [ECF Nos. 660, 661].  Because it was a (C) plea, the Court deferred acceptance of the plea agreement until it had an opportunity to review Defendant's pre-sentence report.  [ECF Nos. 661, 742].

On November 30, 2022, approximately two weeks before his scheduled sentencing, Defendant moved to withdraw his plea.  [ECF No. 714].  After the Court heard argument on the motion, [ECF No. 741], the Court gave Defendant additional time to reconsider his decision to withdraw his plea.  [ECF No. 742].  Defendant's counsel ultimately informed the Court that Defendant wished to proceed to trial, and was prepared to go to trial with his co-defendants who

2

had not pled guilty, in January 2023.  [Id.].  On December 19, 2022, the Court allowed

Defendant to withdraw his plea.  [Id.].

Shortly before the trial began, Basilici's remaining co-defendants pled guilty.  [ECF Nos.

823, 824].  On January 18, 2023, Basilici proceeded to trial as the sole defendant.  [ECF Nos.

826, 887 ("Day 3"), 891 ("Day 2"), 892 ("Day 4"), 893 ("Day 5"), 894 ("Day 6")].

At the close of the government's case, Defendant moved for a judgment of acquittal

pursuant to Federal Rule of Criminal Procedure 29.  [Day 5 at 216:21–225:3].  The Court denied

the motion with leave to renew following the jury's Verdict.  [Id.].  The jury returned its Verdict

on January 26, 2023, finding Basilici guilty on all counts.  [Verdict].

Basilici filed his renewed motion for acquittal as to Counts Five, Nine, and Ten on

February 10, 2023, [ECF No. 862], and his motion for a new trial on February 13, 2023, [ECF

No. 872].[2]  The government opposed both motions on March 24, 2023, [ECF Nos. 913, 914],

and Basilici filed replies in further support of both motions on April 7, 2023, [ECF Nos. 933,

934].[3]

### B.      Evidence at Trial

In reaching its Verdict, the jury could have found the following, based on the evidence

presented at trial.[4]

---

[2] Basilici requested, [ECF No. 857], and the Court granted, an extension of time to February 13, 2023 to file his motion for a new trial, [ECF No. 860].

[3] In addition, Basilici filed a supplemental memorandum in support of the motion for a new trial. [ECF No. 898].

[4] The Court presents the evidence in the light most favorable to the verdict.  See United States v. Meléndez-González, 892 F.3d 9, 17 (1st Cir. 2018).

This case concerns Edwin Otero ("Otero") "and his drug crew['s]" (the "DTO")
distribution of heroin on Cape Cod in Massachusetts and in Rhode Island.  See, e.g., [Day 2 at
71:24–72:6, 124:6–11; Day 5 at 43:11–44:20].  The Investigation into the DTO began at the end
of 2018, [Day 2 at 71:24–72:6], and resulted in the arrests, on May 20, 2019, of among others,
Otero, Basilici, Justin Joseph ("Joseph"), Krymeii Fray ("Fray"), Brooke Cotell ("Cotell"),
Ronny Baams, Tony Johnson ("Johnson"), Eric Brando ("Brando"), Albert Lee ("Lee") and
Cameron Cartier ("Cartier"), see, e.g., [Day 5 at 19:19–21, 29:19–21, 74:5–12].

For purposes of these motions, the evidence at Basilici's trial focused on: (1) Otero and
his associates' drug-trafficking conspiracy, see, e.g., [Day 2 at 49:19–51:15, 78:21–79:6, 97:4–
19, 101:22–102:3, 103:2–107:13, 118:20–119:17; Day 3 at 85:21–103:18; Day 5 at 17:16–20:21,
43:11–49:8]; (2) the kidnapping and assault of a man identified here as the "Assault Victim"[5] on
April 10, 2019 (the "April 10 Assault"), see, e.g., [Day 3 at 103:19–104:5, 105:4–9, 106:10–21,
107:16–19, 152:10–24; Day 4 at 38:3–39:22]; and (3) a shooting at the home of Fray on May 8,
2019 (the "Fray Shooting"), see, e.g., [Day 5 at 27:13–34:6, 139:22–140:2, 154:4–25].

1.      The Investigation of the DTO

The jury heard from several agents and police officers involved in the Investigation of the
DTO, including Daniel Golia ("S.A. Golia"), a special agent with the Drug Enforcement
Administration ("DEA"), [Day 2 at 69:25–70:12]; Kevin Connolly, a detective sergeant with the
Barnstable Police Department, [Day 3 at 21:4–14]; Kevin Fullam ("Sergeant Fullam"), a
sergeant for the Barnstable Police Department, [Day 5 at 43:11–44:20]; Kevin Shaw, a
patrolman for the Barnstable Police Department, [id. at 58:19–59:4]; Brian James Guiney

---

[5] The Assault Victim was referred to by other names at trial as well.  [Day 3 at 63:25–64:4,
105:4–9; Day 4 at 37:3–4, 173:5].

("Officer Guiney"), a retired Barnstable police officer, [id. at 64:20–65:24]; Mark Mellyn

("Officer Mellyn"), a Barnstable police officer, [id. at 73:18–74:1]; Patrick Briody ("S.A.

Briody"), a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, [id. at

84:1–12]; and Sergeant Mark Butler ("Sergeant Butler"), a Sergeant in the Barnstable Police

Department, [id. at 98:17–99:7].

During the course of the investigation of the DTO, officers applied for and were granted

court orders to monitor several phones and to set up video surveillance in March and April of

2019.  See, e.g., [Day 2 at 72:16–19, 74:6–14, 76:14–21, 125:3–13].  They also physically

surveilled Otero and others during the same time period.  See, e.g., [Day 2 at 98:24–99:3

(surveilling Otero's mother's home); Day 4 at 75:16–78:5 (surveilling Fray's home); Day 5 at

43:11–49:8 (Sergeant Fullam surveilling Cotell)].

        2.    <u>Conspiracy Generally</u>

Officers involved in the Investigation testified about several drug deals involving Otero,

Joseph, Cotell, Mike Hilchey, Kim Lopes, Vinicius Zangrande, Johnson, a confidential witness

("CW 1"), and Fray.  See, e.g., [Day 2 at 49:19–51:15, 78:21–79:6, 97:4–19, 101:22–102:3

(heroin deal involving Mike Hilchey); id. at 103:2–107:13 (heroin deal involving Otero, Kim

Lopes (Otero's mother), and Vinicius Zangrande); id. at 118:20–119:17 (heroin deal involving

Otero and Johnson); id. at 131:13–20 (heroin deal involving Joseph); Day 3 at 85:21–101:7

(heroin deal involving CW 1); Day 5 at 17:13–20:21 (heroin deal involving Fray); id. at 43:11–

49:8 (heroin deal involving Cotell)].

With respect to Basilici in particular, in addition to the April 10 Assault and Fray

Shooting, discussed <u>infra</u>, the jury heard evidence of his involvement in a heroin deal and about

communications he had with Otero regarding police surveillance.

Regarding the heroin deal, Otero and Joseph rented a first-floor apartment at 49 Grotto Avenue, Rhode Island (the "Pawtucket Apartment"). [Day 2 at 81:5–8, 82:3–7, 124:12–25]. Basilici lived on the third floor of the same building. [Id. at 82:11–83:2, 125:1–2].

Between April 24 and April 26, 2019, Joseph and another individual discussed a deal for heroin. See [Day 3 at 135:18–138:23]. On April 26, officers intercepted a call between Otero, Joseph, and Basilici. [Id. at 139:2–7]. S.A. Golia testified that on that call, Joseph asked Basilici if he was familiar with Humbolt Street, a street close to the Pawtucket Apartment, which he was. [Id. at 140:16–141:3].[6]  Joseph told Basilici to "go there for that kid," and referred to "1 CD," which S.A. Golia said was a reference to heroin. [Id. at 141:2–142:2]. Shortly thereafter, the individual texting with Joseph texted "[h]ere," [id. at 142:10–14], and Joseph responded, "[h]e will be right there in 2 min," [id. at 143:1–5]. A surveillance camera then captured Basilici exiting the Pawtucket Apartment and walking to Humbolt Street. [Id. at 143:10–15]. Shortly thereafter, the individual texting with Joseph contacted him again, stating "[w]hy you only giving so little usually you hook me up I got 70." [Id. at 143:17–25].

Four days later, on April 30, Basilici and Otero spoke on the phone. [Day 3 at 144:3–5]. During that call, Basilici asked Otero if the Pawtucket Apartment was "clean" because Basilici believed he saw police officers in the neighborhood. [Id. at 144:24–145:14]. S.A. Golia testified, "[b]ased on the context of this call, I believe Mr. Basilici [wa]s asking Mr. Otero if there's any drugs or other items that could get them in trouble with the police in the house." [Id. at 145:6–9]. Otero responded that the house was not clean. [Id. at 145:19–146:2].

---

[6] S.A. Golia testified that after seizing the phones, he listened to calls from the monitored cell phones and "bec[a]me familiar with voices on the calls," including the voices of Otero, Joseph, and Basilici. [Day 2 at 94:13–95:4].

After the call, Basilici sent Otero several text messages in which he identified what he believed were police around the Pawtucket Apartment.  [Day 3 at 147:4–17, 148:14–19].  Around the same time, he was observed on a surveillance camera walking around the Pawtucket Apartment.  [Id. at 147:18–23].  Otero and Basilici then spoke on the phone again, [id. at 148:21–23], and Otero said "they snitching on our house" which S.A. Golia interpreted to mean "[t]hat [Otero] believe[d] somebody [wa]s telling the police that [the Pawtucket Apartment] [wa]s associated with criminal activity," [id. at 149:10–15].  Basilici told Otero that he had videos, [id. at 149:17–150:11], and after seizing Basilici's phone, investigators found videos from April 30 "where he[] [was] calling in license plates to different vehicles or vehicles that he th[ought] could be unmarked police cars," [id. at 151:10–23].

### 3.    The April 10 Assault

The April 10 Assault took place in the "early morning hours of April 10, 2019."  See [Day 3 at 152:19–24].  The day before, the Assault Victim travelled from Massachusetts to Rhode Island to meet Otero in an UBER paid for by Otero.  [Day 4 at 178:17–23, 180:14–181:19].  When the Assault Victim arrived in Rhode Island, he, Otero, and others went to a strip club.  [Id. at 181:25–182:9].

After two hours at the club, they went back to the Pawtucket Apartment.  [Day 4 at 182:10–23].  Shortly thereafter, the Assault Victim was hit in the head and a full throttle assault, lasting for approximately ten to fifteen minutes followed.  [Id. at 182:24–183:5].

The assault was captured on a video found on Otero's phone.  [Day 3 at 152:4–24; Day 4 at 38:3–39:22].  S.A. Golia testified that he identified Basilici as the videographer based on tattoos on his arm that showed up in the video.  [Day 3 at 155:1–24; Day 4 at 27:9–11].  Otero, Ryan Smith, Joseph, Lee, and Cartier were also present during the assault as reflected in the video.  [Day 3 at 156:11–16].

7

In the video, among other things, the Assault Victim was hit and sexually assaulted with a hammer.  [Day 4 at 153:6–154:25].  As to Basilici, S.A. Golia told the jury that in addition to filming the assault, Basilici made several statements on the video, although Basilici disputes the accuracy of the Agent's voice identifications.  [Day 3 at 155:1–24; Day 4 at 35:15–21, 36:4–9].[7] First, S.A. Golia said that during the assault, the Assault Victim was "on the floor," Otero was "standing over him," "Basilici was filming," the Assault Victim was told to kiss Otero's feet, and Basilici said "he ain't kiss it."  [Day 4 at 35:12–24, 36:4–9, 121:23–122:3].[8]  Basilici also at one point said "[d]on't just let him walk out."  [Day 3 at 155:1–24].[9]  In addition, Otero asked for tape, Basilici walked into the kitchen and came back with some and threw it on the couch.  [Day

_____

[7] With respect to the disputed voice identifications and the accompanying transcripts, the Court instructed the jury that,

> you'll see it's a cross-out.  Those voice identifications are disputed.  I mean, you'll sort this out for yourselves, but the government believes it's Mr. Basilici's voice, and the defense believes it's not Mr. Basilici's voice.  That is a question of fact that you all will have to determine.  I didn't understand there was a dispute about this on [Day 3].  I think [S.A. Golia] may have testified to his opinion on one or more of those identifications.  But that – that's his opinion, it may or may not be correct.  But the factual determination of whose voice that is or isn't, or if it's indeterminate, that's up to you all, not to the agent.  And you'll see on the transcripts we've crossed it out, so you'll see which are the disputed voice identifications.

[Day 4 at 17:10–23].  The Court gave a similar instruction on other occasions when S.A. Golia identified voices.  See [id. at 33:14–17 ("They're going to play the excerpts of the tapes, and I want you to remember where the speaker has been crossed off, it is disputed and it is for you to decide who the speaker is."); id. at 36:13–15 ("You'll remember and you'll see from the transcript that is disputed who spoke that, and it is for you all to decide, not him")].

[8] The jury heard testimony that in the transcript of the video, this statement was at one point attributed to an "unknown male," but changed before trial to be attributed to Basilici.  [Day 4 at 122:4–20].

[9] The jury heard testimony that in the transcript of the video, this statement was at one point attributed to another individual, but changed before trial to be attributed to Basilici.  [Day 4 at 118:15–120:15].

4 at 113:13–21].  The tape was not "used to confine" the Assault Victim in the videos.  [Id. at 113:22–23, 114:5–8].  Finally, during the assault, individuals in the video, although not Basilici, called the Assault Victim a "rat."  [Id. at 114:16–24].

After the assault, CW 1 testified that in April 2019, Otero sent him a video in which the Assault Victim had been kidnapped and stripped naked, and Otero was harassing the Assault Victim with a gun.  [Day 3 at 103:19–104:5, 105:4–9, 106:10–21, 107:16–19].  CW 1 said that he thought Otero showed him the video to "show off, make himself look like he's a big tough guy and try to intimidate me if I ever decide to tell."  [Id. at 114:23–115:1].  In addition, CW 1 testified that Otero told him that the reason for the assault was that the Assault Victim and Otero had been pulled over with drugs, but were not arrested, and that Otero therefore concluded that the Assault Victim was working with police.  [Id. at 104:20–105:9].

Similarly, Otero showed Cotell the video of the April 10 Assault over FaceTime and explained to Cotell that "he had convinced [the Assault Victim] to go to his house with him and said that he had girls and liquor and brought him to his house, and him and some other people jumped him and assaulted him."  [Day 4 at 150:24–151:14].  According to her testimony, Otero told her that he assaulted the Assault Victim because he "was cooperating against him.  He said, he had told me they'd gotten pulled over and that neither one of them had a license, and they were separated and then let go.  So he felt like he was telling on him because of that, that [the Assault Victim] was telling on him."  [Id. at 152:20–25].  Otero also told Cotell to describe what she had seen in the video to Darrell Russ, who owed Otero money, so Otero could "intimidate" Russ.  [Id. at 156:3–24].

4.      The Fray Shooting

The Fray Shooting happened nearly a month later, on May 8, 2019.  [Day 5 at 27:13–28:22].  The shooting was likely the result of a drug debt owed by Fray to Otero.  See [Day 4 at 72:24–73:15]; see also [Day 5 at 21:15–27:13, 103:10–22].

Specifically, Fray had received 100 grams of heroin from Otero.  [Day 5 at 17:13–15].  Otero "charge[d]" him $6,000 for the heroin.  [Id. at 17:16–18:1].  Fray did not pay when he initially received the drugs, [id.], and instead paid Otero $3,700 after Fray sold the drugs, [id. at 18:8–10].  He gave the $3,700 to Otero's mother, [id. at 18:11–15], after which she gave him an additional 100 grams of heroin that she said was from Otero, [id. at 19:7–20:13].  Fray did not pay for the second 100 grams of heroin.  [Id. at 20:19–21].

Fray told the jury that the "amount of heroin . . . outstanding with [] Otero. . . cause[d] problems between" them.  [Day 5 at 20:22–25].  S.A. Golia similarly testified that between April 20 and May 8, 2019, based on calls and text messages between Otero and Fray, "it appeared they were getting agitated with each other over a possible drug debt or money debt."  [Day 4 at 72:24–73:15]; see also [Day 5 at 21:15–27:13, 103:10–22].

On May 8, after calls and texts regarding the debt, see, e.g., [Day 5 at 21:15–27:13], Fray was at his home on Lafrance Avenue in Hyannis (the "Fray House"), [id. at 27:13–15]; see also [id. at 8:12–16].  That evening, Fray went outside to look for his cell phone.  [Id. at 27:16–20].  While outside, he "hear[d] footsteps running up behind" him and he "start[ed] fighting . . . two guys," one of whom was Otero.  [Id. at 27:21–28:13].  While they were fighting, the other

individual, Joseph, fired a gun at Fray.  [Id. at 28:14–29:5, 34:3–6].[10]  Joseph later apologized to Fray for the shooting and said that "Otero made him do it."  [Id. at 41:18–23].

From the officers' perspective, earlier that night, S.A. Golia was conducting surveillance near an apartment complex at 800 Bearses Way in Hyannis, MA, named Cape Crossroads, where Otero's mother lived ("Cape Crossroads").  [Day 2 at 78:21–79:3, 98:24–99:3; Day 4 at 74:24– 75:5].  He saw Otero's girlfriend's car, a Honda Accord (the "Accord"), leave Cape Crossroads and drive toward Lafrance Avenue.  [Day 4 at 75:16–76:11].  The Accord passed the Fray House twice, and fearing trouble, S.A. Golia left the area to call his supervisor.  [Id. at 77:14–78:1].  Shortly thereafter, one of the surveillance officers reported "that they heard what they thought was a gunshot."  [Id. at 77:14–78:5].[11]

Sergeant Butler was also conducting surveillance of Cape Crossroads that evening.  [Day 5 at 101:20–102:5].  He had initially gone home for the day, [id. at 102:6–8], but went back out when he learned that the Accord had gone from Cape Crossroads to the Fray House, [id. at 102:17–103:2, 105:10–24].

While Sergeant Butler was on his way to the Fray House, and apparently after the

---

[10] Fray did not initially report the shooting to police "because [he] didn't want" any "problem[s]."  [Day 5 at 33:13–24].  Officers also found a 9-millimeter firearm in Fray's apartment.  [Id. at 34:14–20].

[11] The Court instructed the jury that

> you're not allowed to say what somebody else said, generally speaking, because they're not here to be cross-examined.  So that statement does not come in for the truth of the matter asserted.  So it's not to establish that a shooting happened, but he can ask the question so that he can explain why he takes another action.  So it's not for the truth, you can't find that a shooting happened based on that statement, but he's now going to explain what he did next and why he did it once he got that information, whether the information is true or not.

[Day 4 at 78:7–17].

shooting, he received a call that an officer in a nearby town, Osterville, saw the Accord traveling at a high rate of speed.  [Day 5 at 104:6–105:24].  After receiving this report, Sergeant Butler drove to Brando's house in Osterville instead of to the Fray House because Brando was a known associate of Otero's, and Butler suspected the Accord may be heading there.  [Id. at 104:17–105:9, 106:7–14].

The Accord had crashed into the woods near Brando's home, and officers towed it back to the Barnstable Police Department.  [Day 5 at 116:22–117:3, 118:14–19].  Although officers believed individuals from the car were hiding in the woods, they did not search for them because they "determined that it would be the best thing for the investigation . . . to slowly back away from the scene."  [Id. at 114:9–14, 116:8–21].

Meanwhile, Otero's girlfriend had gone to the police station to report the Accord stolen.  [Day 5 at 118:2–13].  Although officers did not believe her, they allowed her to take the vehicle because they "decided to, in furtherance of the investigation, . . . return[] the car to her."  [Id. at 118:20–119:8].  She then took the car to Cape Crossroads.  [Id. at 119:24–120:11].

In the hours that followed, investigators intercepted several calls between Otero, Otero's girlfriend, Basilici, Joseph, and others.  See [Day 5 at 123:8–136:8].  In one call on May 9 at 1:52 AM, [id. at 135:9–22], Otero and Joseph discussed that Basilici had "been in the woods the whole time," and that the police had drones looking for them, [id. at 135:20–137:20].  Basilici confirmed on a subsequent call that he had been in the woods.  [Id. at 146:9–147:10].

That same evening, Sergeant Fullam went to speak with Fray.  [Day 5 at 52:4–18].  When returning to his car after speaking with Fray at the Fray House, Sergeant Fullam "observed a [gun] magazine right on the edge of the road in the grass" in front of the house next door, which

had ammunition in it.  [Id. at 53:4–11].  The magazine and ammunition were marked at trial as

Exhibit 146 (the "Magazine and Ammunition").  [Id. at 53:16–23].

     The next morning, Otero made a call to his girlfriend in which he said, paraphrased, "I

had to hit this guy last night, I shot the whole place, I went crazy last night."  [Day 5 at 139:22–

140:2]; see also [Day 4 at 52:10–16].  That same day, while surveilling the Fray House, Officer

Guiney, [Day 5 at 66:3–7], observed Otero and Joseph "looking around at their feet," [id. at

66:18–67:2], but did not see them pick anything up, [id.].

     Two days after the Fray Shooting, on May 10, officers intercepted another call between

Otero and Basilici in which, as Sergeant Butler testified,

> Otero was really trying to determine where Basilici threw his CD out.  "CD"
> throughout this case we've interpreted to be guns, drugs, anything vice related.  So
> he really wants to know where he threw the CD, particularly so he can go back and
> try to find it.
>
> He's also very concerned because the CD they threw out no longer has the tracks
> on it.  Throughout the call he's clearly concerned that it happened to somebody
> else, [who] goes by "Sleep."  He's clearly concerned that the police removed the
> magazine or found the gun with the magazine in it, removed the magazine, and kept
> the gun there and would try to catch them in the act of going back to retrieve it.
> That's where [Otero] talks about – that's what happened to "Sleep," that's how they
> get us, that type of things.
>
> So those are the two things, where Basilici threw his gun, CD; and he's also
> concerned that the gun they have that they recovered does not have the tracks on it,
> the magazine, and he's concerned that the police have positioned it in a way to catch
> them going back to retrieve it.

[Day 5 at 154:4–25][12]; see also [id. at 155:9–157:5 (similar)].  Sergeant Butler further testified

that "CDs" has typically been used by the subjects of the investigation "to describe guns, it's

---

[12] Counsel for Basilici moved to strike this testimony, and the Court stated the following:
"[w]ell, that is his opinion and understanding [of] what's on that tape.  You all, [the jury], are the
fact finders.  You'll make the determination whether you agree with that or you don't based on
what you read in the transcript."  [Day 5 at 155:3–7].  Thereafter, on cross-examination, Sergeant

been used to describe drugs; those have been two main things.  It's been somewhat interchangeable.  CDs has primarily been guns, and mixed tapes has been magazines, but it's been both."  [Id. at 157:7–15].  Finally, he told the jury that the call suggested to him that Otero and Basilici were talking about more than one gun, possibly three.  [Id. at 159:16–24].

On May 20, 2019, officers made a series of arrests "stemming from [the] drug trafficking investigation into [] Otero."  [Day 5 at 74:5–12].  As part of that effort, Officer Mellyn executed a search warrant at Otero's grandmother's apartment.  [Id. at 74:20–76:12].  There he found and seized a rifle that did not have an ammunition magazine.  [Id. at 78:20–80:10].  The rifle was marked as Exhibit 148 (the "Rifle").  [Id.].  In addition, after arresting Fray that day, S.A. Golia went to his apartment several days later on May 29 and recovered a shell casing on the back steps of the apartment (the "Shell Casing").  [Day 4 at 82:7–20, 84:11–24, 131:1–10, 132:10–12].

S.A. Briody examined both the Magazine and Ammunition found near the Fray House, see [Day 5 at 85:20–86:3], as well as the Rifle found at Otero's grandmothers house, see [id. at 88:7–12].  He testified that the Magazine fit into the Rifle and "worked as designed."  [Id. at 89:8–21].  He also concluded that the Shell Casing, [Day 5 at 90:7–10], did not match the Rifle or another firearm seized from the Fray House, [id. at 90:11–93:21].

## II.    ACQUITTAL UNDER RULE 29

### A.    Legal Standard

To prevail on a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, a defendant must "show that the evidence presented at trial, even when viewed in

---

Butler could not identify any other time in which "CD" was used to describe guns.  See, e.g., [id. at 187:15–188:5].

the light most favorable to the government, did not suffice to prove the elements of the offenses beyond a reasonable doubt." United States v. Acevedo, 882 F.3d 251, 257 (1st Cir. 2018). On a Rule 29 motion, the Court does not "weigh the evidence or make any credibility judgments, as those are left to the jury." United States v. Merlino, 592 F.3d 22, 29 (1st Cir. 2010) (citing United States v. Ayala-Garcia, 574 F.3d 5, 11 (1st Cir. 2009)). Rather, the Court "resolve[s] all credibility disputes in the verdict's favor," id. (quoting United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995)), and "examine[s] the evidence—direct and circumstantial—as well as all plausible inferences drawn therefrom, in the light most favorable to the verdict," United States v. Meléndez-González, 892 F.3d 9, 17 (1st Cir. 2018) (internal quotation marks omitted).

The verdict will be upheld if it is "supported by a plausible rendition of the record." Merlino, 592 F.3d at 29 (quoting United States v. Bristol-Martir, 570 F.3d 29, 38 (1st Cir. 2009)). "If the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged," the Court must reverse the conviction because "where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, a reasonable jury must necessarily entertain a reasonable doubt." United States v. Burgos, 703 F.3d 1, 10 (1st Cir. 2012) (quoting United States v. Flores-Rivera, 56 F.3d 319, 323 (1st Cir. 1995)).

### B.       Discussion

In his motion for acquittal, Basilici asserts that the government failed to present sufficient evidence to prove, as relevant to Counts Nine and Ten, that he agreed to participate in the kidnapping, [ECF No. 862 at 8–16], and, as relevant to Count Five, that he possessed a firearm in furtherance of the drug conspiracy, [id. at 24–28].

1.     Kidnapping Conspiracy (Count Nine)

Under Count Nine, Basilici was found guilty of conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c).  [Verdict at 3].  A person violates 18 U.S.C. § 1201 if they

> (a) . . . unlawfully seize[], confine[], inveigle[], decoy[], kidnap[], abduct[], or carr[y] away and hold[] for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when-
>
> (1) . . . the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense; . . . [and]
>
> (c) If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy.

United States v. Djokich, 693 F.3d 37, 43 n.2 (1st Cir. 2012) (quoting 18 U.S.C. § 1201) (alterations in original).  "To prove a conspiracy to kidnap, the Government must show '(1) an agreement between two or more persons to achieve an unlawful goal; (2) the defendant intentionally joined the agreement, with knowledge of its objective; and (3) an overt act taken in furtherance of the conspiracy by a co-conspirator.'"  United States v. Rivera, No. 19-cr-00391, 2023 WL 3294847, at *5 (E.D. Pa. May 4, 2023) (quoting United States v. Whiteford, 676 F.3d 348, 357 (3d Cir. 2012)).  "The Government must also prove 'that the intended future conduct they had agreed upon include[d] all the elements of the substantive crime.'"  Id. (quoting United States v. Manzo, 636 F.3d 56, 68 (3d Cir. 2011)).

Basilici argues that "[i]t is not enough for the government to prove that a kidnapping conspiracy existed and that Mr. Basilici knew of the conspiracy, was present during the substantive offense, and failed to stop or report it."  [ECF No. 862 at 9–10].  Rather, "he had to have agreed to *join* in it; to *participate* in it; to further the object of it, which was to restrain [the Assault Victim]."  [Id. at 10 (emphasis in brief)].

Specifically, he avers that (1) though "videotaping [] the assault on [the Assault Victim] could support an inference that the cameraman did not actively oppose the acts . . . , it does not support an inference that [] he agreed to participate in restraining [the Assault Victim]," [ECF No. 862 at 10]; (2) retrieving a the roll of tape in response to Otero's order to do so "did not indicate an agreement to participate" because "Basilici never gave the tape to [Otero or the others present]" and instead threw it onto the couch and it was never used, [id.]; and (3) the Court should not accept S.A. Golia's voice identification testimony identifying Basilici in videos of the assault, [id. at 11].

The government responds, among other things, that (1) "[t]he first minute of Exhibit 114 leaves no mistake . . . about the fact [of] the conspiracy, nor its object: forcibly hold and detain [the Assault Victim], so he can be ruthlessly beaten," [ECF No. 914 at 4]; (2) "Otero, Joseph, and Lee all perform numerous overt acts to further their shared goal," [id.]; and (3) when Otero, Joseph, and Lee's

> efforts do not suffice, Otero demands that someone retrieve tape. Inescapably implicit in this request, is that Otero wants to use tape to restrain the victim. By retrieving the large roll of duct tape while armed with the knowledge of what happened in the first minute inside that apartment, and while seeing the kidnapping conspiracy in action, Basilici demonstrated his agreement to join that conspiracy and his intention to help accomplish it. From this evidence alone, without saying a word, or ever laying a hand on the victim, Basilici was guilty of [] Count Nine.

[Id.].

From this evidence, the jury could have easily found that Basilici agreed to join, participate in, and further the objective of restraining and assaulting the Assault Victim. Among other things, viewing the evidence in the light most favorable to the verdict, Basilici witnessed and recorded the assault, [Day 3 at 155:1–24; Day 4 at 27:9–11], encouraged the conduct and participated in efforts to prevent the Assault Victim from leaving the room, [Day 3 at 155:1–24; Day 4 at 35:15–21, 36:4–9, 121:23–122:3], and retrieved means (tape) to further restrain the

Assault Victim, [Day 3 at 113:22–23, 114:5–8]. With respect to S.A. Golia's voice identification testimony that provided a basis for some of these findings, the jury was given ample instruction regarding the weight to give that testimony, <u>see</u> [Day 4 at 17:10–23, 33:14–17, 36:13-15], and was told that it could weigh the fact that the government's identification of the speaker changed during the case, [<u>id.</u> at 118:15–120:15, 122:4–20]. In sum, the jury could have found facts sufficient to support a guilty verdict as to Count Nine, and the Court accordingly denies the motion for acquittal as to that Count.

        2.     <u>Retaliation Conspiracy (Count Ten)</u>

Under Count Ten, Basilici was found guilty of conspiracy to obstruct justice by retaliating against a witness, victim, or informant in violation of 18 U.S.C. § 1513(f). [Verdict at 3]. Pursuant to § 1513(b):

> Whoever knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for—
>
> (1) the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or
>
> (2) any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings given by a person to a law enforcement officer;
>
> or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1513(b). Further, pursuant to § 1513(f), "[w]hoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1513(f).

In his opening brief, Basilici's primary argument for acquittal as to Count Ten is the same as his argument for Count Nine; that is, that the evidence was not sufficient to show that Basilici

agreed to join in the kidnapping conspiracy.  See, e.g., [ECF No. 862 at 10–11].  He further asserts that the evidence was also insufficient to support an inference that he entered into a conspiracy "to obstruct justice by retaliation against a witness," [id. at 11], or "that he willfully joined in a conspiracy to cause bodily injury or damage to the personal property of the victim to retaliate against him based on the belief that he had cooperated with law enforcement," [ECF No. 933 at 4–5].

The government, on the other hand, avers that "[b]y continuing to film for more than 10 minutes as his co-conspirators beat the victim nearly unconscious, while yelling that the victim was a 'rat,' and that this is what the victim gets for 'talking,' Basilici willfully joined that agreement to retaliate against the victim."  [ECF No. 914 at 8–9].  Basilici also "instructed others to not let the victim walk out" after Otero asked what the group did to individuals who spoke to police.  [Id.].

The jury could have found that the purpose of the assault was retaliation for Owen's suspected involvement with the police, see, e.g., [Day 4 at 152:20–25], that the video was taken for the underlying purpose of intimidating other witnesses, see, e.g., [Day 3 at 114:23–115:1], and that all those present, including Basilici, were aware of and willing participants in the assault and its underlying purpose, see, e.g., [Day 4 at 113:13–24, 114:16–24].  This is sufficient to support a guilty verdict on Count 10, and the Court accordingly denies the motion for acquittal as to that Count.

### 3.   Firearm in Furtherance of the Drug Conspiracy (Count Five)

Under Count Five, Basilici was found guilty "of possessing a firearm in furtherance of the drug trafficking conspiracy."  [Verdict at 2].  He was also found to have discharged that firearm.  [Id.].  Under § 924(c)(1)(A)(iii),

any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime-- . . . (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(l)(A).

    Basilici argues that

[t]he evidence on Count Five was insufficient to support the guilty verdict in this case for lack of evidence beyond a reasonable doubt that Mr. Basilici was with Otero and Joseph when they went to [Fray]'s house to shoot him[], or that he was involved in the shooting or possessed a firearm in furtherance of the drug conspiracy on May 8.

[ECF No. 862 at 17].[13]  Specifically, he avers that "[t]he government's case against Mr. Basilici on Count Five consisted mainly, if not exclusively, on phone calls between him and Otero after May 8: one on May 9 (Exhibit 87 – TT2, Session 2083) and one on May 10 (Exhibit 94 – TT2, Session 2146)," [id. at 20], and Sergeant Butler's interpretation of those calls, [id. at 26].  In addition, he states that his alleged "hiding and flight do not establish guilt of the § 924(c) offense."  [Id. at 27].

    In response, the government argues that "Otero and Basilici spoke, at length, about where to find guns and ammunition the men threw out of the getaway vehicle as they fled after the [Fray S]hooting . . . us[ing] 'CD' as a code word for the guns in this particular conversation." [ECF No. 914 at 10].  With respect to whether the firearm was discharged, the government asserts "that Basilici possessed a firearm to further the drug conspiracy on May 8, 2019, and that Otero and Joseph also possessed firearms to further the drug conspiracy on this date, that this

---

[13] For purposes of this motion, Basilici "'assume[ed] that there was sufficient evidence to support a jury finding that Otero and Joseph'" went to the Fray House "in possession of a firearm and that the firearm was discharged."  [ECF No. 933 at 6 n.6 (quoting ECF No. 862 at 17)].

was foreseeable to Basilici because he was in the car with them for the shooting, and that the firearm was discharged."  [Id. at 17].

The jury had the option of finding Basilici guilty of Count Five on two different theories. The first was that he was with Otero and Joseph that night and in possession of a firearm that he did not discharge.  The second was that it was foreseeable to him that Joseph and/or Otero would fire a gun that evening.  There was sufficient evidence for the jury to convict Basilici on either theory.

First, the jury could have found that Basilici was with Otero and Joseph in the Accord the night of the Fray Shooting as the vehicle fled the Fray House, that he possessed a firearm and that he hid in the woods to avoid capture by the police.  See, e.g., [Day 5 at 135:20–137:20, 146:9–147:10, 154:4–25].  In addition, the jury could have credited Sergeant Butler's testimony that, in the context of Otero and Basilici's conversation about the evening of May 8, "CDs" referred to guns, and that Basilici threw his weapon out the window of the car.  See [Day 5 at 154:4–25, 157:7–15, 159:16–24].[14]

Alternatively, the jury could have found that it was foreseeable to Basilici that a firearm would be discharged and that he was responsible for that discharge under a Pinkerton theory of liability.  At trial, the government explained that

> [t]here's never been an allegation that Basilici fired the gun; we know it was fired. So to the extent the firearm was used and discharged, Anthony Basilici is liable for that under Pinkerton.  So it is -- he both possessed a gun himself in furtherance, and also the jury could find just as equally that he -- that it was reasonably foreseeable to him that Joseph would fire the gun that was used and discharged.

[Day 6 at 27:2–8].

---

[14] As explained above, Counsel for Basilici moved to strike this testimony, and the Court instructed the jury that it was their decision "whether [they] agree with that or [they] don't based on what [they] read in the transcript."  [Day 5 at 155:3–7].

Under the <u>Pinkerton</u> doctrine, "a jury [may] find a defendant liable for the substantive crimes his co-conspirators committed in furtherance of the conspiracy if it w[as] reasonably foreseeable that those crimes would occur." <u>United States v. Serrano-Delgado</u>, 29 F.4th 16, 23 (1st Cir. 2022) (citing <u>United States v. Bucci</u>, 525 F.3d 116, 132 (1st Cir. 2008)); <u>see also</u> <u>Pinkerton v. United States</u>, 328 U.S. 640, 647–48 (1946). For example, in <u>Serrano-Delgado</u>, where the defendant acted as the "get-away driver" for a robbery in which a firearm was discharged by a co-conspirator, <u>see</u> 29 F.4th at 23, the First Circuit affirmed the defendant's conviction for "discharging a firearm in relation to a crime of violence resulting in death," <u>id.</u> at 20, and reasoned that "the jury could have found Serrano guilty of conspiracy" by, in addition to other things, "concluding that he knowingly joined the robbery as the get-away driver." <u>Id.</u> at 28.

Here, there was ample evidence that a firearm was discharged in the course of the Fray Shooting. <u>See, e.g.</u>, [Day 5 at 28:14–29:5, 34:3–6, 41:18–23, 139:22–140:2]. Further, the jury heard evidence from which it could have reasonably found that Basilici possessed a firearm and was personally involved in the Fray Shooting or that he was a member of the conspiracy, and the shooting was foreseeable to him. <u>See, e.g.</u>, [Day 5 at 135:20–137:20, 146:9–147:10, 154:4–25, 157:7–15, 159:16–24]. Accordingly, the Court declines to overturn the jury's Verdict on Count Five.

## III.    NEW TRIAL UNDER RULE 33

### A.    Legal Standard

On a motion for a new trial under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "In considering a motion for a new trial, district courts may 'weigh the evidence and

evaluate the credibility of witnesses, . . . [but] the remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict.'"  Merlino, 592 F.3d at 32 (quoting United States v. Wilkerson, 251 F.3d 273, 278 (1st Cir. 2001)).  "[I]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." Id. at 32–33 (internal quotation marks omitted) (quoting United States v. Cote, 544 F. 3d 88, 101 (2d Cir. 2008).  "A district court 'judge is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result.'"  United States v. Rivera-Rangel, 396 F.3d 476, 486 (1st Cir. 2005) (quoting United States v. Rothrock, 806 F.2d 318, 322 (1st Cir. 1986)).

Basilici moves for a new trial on two grounds: (1) "the government's failure to disclose multiple pieces of evidence that were material to the preparation of the defense, both exculpatory and inculpatory," and (2) prosecutorial misconduct by way of "misstatements of the evidence in the government's opening and closing argument."  [ECF No. 873 at 1].

## B.       Disclosure of Evidence

"Government[] disclosures must be made in a timely manner."  United States v. Kifwa, 868 F.3d 55, 60 (1st Cir. 2017).  "If disclosure is delayed without any suggestion of bad faith on the government's part, 'the critical inquiry is . . . whether the tardiness prevented defense counsel from employing the material to good effect.'"  Id. (quoting United States v. Devin, 918 F.2d 280, 290 (1st Cir. 1990)).  "In conducting this inquiry, 'a court's principal concern must be whether learning the information altered the subsequent defense strategy, and whether, given timeous disclosure, a more effective strategy would likely have resulted.'"  Id. (quoting Devin, 918 F.2d at 290); see also United States v. Perez-Ruiz, 353 F.3d 1, 8 (1st Cir. 2003) ("When Brady or

Giglio material surfaces belatedly, 'the critical inquiry is not why disclosure was delayed but whether the tardiness prevented defense counsel from employing the material to good effect.'" (quoting Devin, 918 F.2d at 290)); Devin, 918 F.2d at 290 ("A defendant who claims that his hand was prematurely forced by delayed disclosure cannot rely on wholly conclusory assertions but must bear the burden of producing, at the very least, a prima facie showing of a plausible strategic option which the delay foreclosed."). Here, Basilici argues that the government's delayed production of three pieces of evidence warrants a new trial. [ECF No. 873 at 3–22]. A discussion of each follows.

1.    S.A. Golia's Voice Identification Testimony

Basilici first argues that S.A. Golia's voice identifications with respect to the videos of the April 10 Assault, accompanied by transcripts that had been updated within two weeks of trial to identify Basilici as the speaker instead of someone else, [ECF No. 873 at 8], was a late disclosure of inculpatory evidence that prevented him from staging a viable and reasonable defense, see [id. at 13–14]. Specifically, Basilici avers that the late disclosure prevented him from "challeng[ing] the reliability of the voice identification based on the quality of the audio and based on S.A. Golia's limited familiarity with two of the other voices on the audio," "fil[ing] a motion in limine to exclude Golia's testimony," and/or "call[ing] other witnesses who are familiar with [Basilici's] voice to counter Golia's testimony." [Id. at 14].

In response, the government argues that "the government disclosed its evidence of the kidnapping video well in advance of trial," and in any event, Basilici "succeeded in having the Court strike the identifications before the jury ever saw the transcript and thoroughly cross-examined the case agent about the 'new' voice identifications, and because the Court issued multiple limiting instructions on the matter." [ECF No. 913 at 4]. Moreover, it avers that "removing the voice identifications would have no impact on the verdict—the evidence of

24

Basilici's participation in the kidnapping was overwhelming even if the voice identifications were completely disregarded." [Id. at 5].

The Court agrees with the government.  First, the jury was clearly instructed that the "voice identifications are disputed," and that "the government believes it's Mr. Basilici's voice, and the defense believes it's not Mr. Basilici's voice." [Day 4 at 17:10–23]; see also [id. at 33:14–17 ("They're going to play the excerpts of the tapes, and I want you to remember where the speaker has been crossed off, it is disputed and it is for you to decide who the speaker is."); id. at 36:13–15 ("You'll remember and you'll see from the transcript that is disputed who spoke that, and it is for you all to decide, not him")].  S.A. Golia was also cross-examined on the fact that individuals identified in the transcript as someone else had been changed to Basilici before trial.  See [id. at 122:4–20, 118:15–120:15].  Thus, the jury had ample instruction and reason to critically weigh the reliability of S.A. Golia's voice identification testimony.

Second, there was ample additional evidence to support the jury's Verdict on Counts 9 and 10, particularly given Basilici's presence and involvement as the videographer, see [Day 3 at 155:1–24; Day 4 at 27:9–11, 114:16–24], and the fact that he got tape when asked to do so by Otero, see [Day 4 at 113:13–21].  Accordingly, the Court denies Basilici's request for a new trial based on S.A. Golia's voice identification testimony.

2.     CW 1's Testimony Regarding Assault Video

Basilici next argues that CW 1's testimony that, in the video, Otero was "putting [a] gun, like, near his mouth and making it look like he was going to rape him with the gun and stuff," [Day 3 at 107:16–19], was inconsistent with the Government's description of CW 1's testimony prior to trial, which was the following:

> [CW 1] was aware of the attack because Otero showed him the video over FaceTime.  From the video of the attack, [CW 1] could see Otero holding an object and standing behind [the Assault Victim] while [the Assault Victim] was naked,

> [the Assault Victim] was bent over and forced by Otero to "beg for his life" and
> Otero threatened [the Assault Victim], "Do you want me to stick it in you?"

[ECF No. 873 at 15 (emphasis added)].  Basilici further avers that CW 1's "testimony about

Otero holding a gun at [the Assault Victim] was a complete surprise," [id. at 16], and that

because "[CW 1] testified for the government with a cooperation agreement, it is reasonable to

infer that one or more members of the prosecution team [had] met with [CW 1] to discuss [CW

1]'s testimony before he gave it, and that [CW 1]'s trial testimony was not a surprise to the

prosecutors," [id. at 17].  Basilici further states that "[t]he prejudice . . . resulting from [CW 1's]

testimony about the gun was not limited to the kidnapping and related counts" because it "was

the only evidence admitted at trial that that could have supported the conclusion that Otero's

possession of a firearm on May 8 (Count Five) was foreseeable to Mr. Basilici, based on Mr.

Basilici's presence in Otero's apartment during the beating of [the Assault Victim]."  [Id.].  "Had

the government disclosed [the] statement about a gun, Mr. Basilici would have been in a position

to cross-examine [CW 1] much more effectively."  [Id.].

In response, the government argues that Basilici was informed of the change in CW 1's

testimony from him having seen an "object" in the video to him thinking that the object was a

gun, [ECF No. 913 at 3], and that Basilici was able to fully cross-examine CW 1 on this issue,

[id. at 4]; see also [Day 3 at 123:3–124:21 ("Q.  You're saying that Mr. Otero had a gun in his

hand?  A.  Yes. . . . Q.  Do you remember at your proffer session discussing this same video?  A.

Yes. . . . Q.  Can you find anything in [your proffer] where you say that Mr. Otero had a gun in

the video that you saw?  A.  No. . . . Q.  [] you said it was an object.  You did not tell them it

was a gun?  A.  I thought it was a gun.  Q.  You didn't tell that to the prosecutors, did you?  A.  I

thought I did, but obviously I must not have, but I knew he had some type of object in his hand.

I'm assuming it was a gun.")].  Moreover, with respect to Count Five, the government avers that

"there was ample other evidence that Otero had a gun, including the fact that a gun was seized from his grandmother's house and that Otero bragged over the phone about 'shooting the place up' right after the shooting at Fray's house."  [ECF No. 913 at 4].

Here, the Court finds that any change in CW's testimony was not so prejudicial as to warrant a new trial and was instead fodder for cross-examination, which Basilici effectively took advantage of.  [Day 3 at 123:3–124:21].  Whether the "object" in the video was a gun, or something else, does not undermine the evidence of Basilici's participation and involvement in the kidnapping and assault.  Moreover, with respect to Count Five, there was ample additional evidence of gun use surrounding the Fray Shooting that the jury could have relied on to reach its Verdict.  See, e.g., [Day 5 at 28:14–29:5, 34:3–6 (Fray testifying that he was shot at); id. at 41:18–23 (Joseph apologizing for the shooting); id. at 139:22–140:2 (Otero stating "I had to hit this guy last night, I shot the whole place, I went crazy last night"); id. at 154:4–25 (Otero and Basilici discussing "CDs" coupled with Sergeant Butler's testimony that CD's refer to guns)].  Accordingly, the Court denies Basilici's request for a new trial based on CW 1's testimony regarding the video of the April 10 Assault.

> 3.    Shell Casing

Finally, Basilici argues that he is entitled to a new trial because "[a]t no time before Briody took the stand did the government disclose that the Shell Casing found in [Fray's] backyard at 63 Lafrance Street did not match the rifle admitted into evidence as Exhibit 148 or the nine rounds of ammunition in the magazine found at 55 Lafrance."  [ECF No. 873 at 19].  Basilici avers this entitles him to a new trial for either one of two reasons: (1) the failure to disclose testimony and/or reports of physical examinations or scientific tests violated Federal Rules of Criminal Procedure 16(a)(1)(G) and (F), [id. at 20]; and/or (2)

> [h]ad Mr. Basilici known that the [S]hell [C]asing was unrelated to the rifle and
> ammunition admitted into evidence, he could have pursued a defense contesting
> whether the shooting ever occurred.  He could have made <u>Petrozziello</u> objections
> to the admissions by Otero and Joseph [regarding the shooting], and filed motions
> in limine to preclude their admission.  But no[t] knowing about the mismatched
> evidence, it made no sense to pursue such a strategy, focusing instead on the lack
> of evidence that Mr. Basilici was involved in the shooting.

[<u>Id.</u> at 22 (internal citation omitted)].[15]

In response, the government states that (1) it "produced a brief report authored by Special Agent Golia noting that DEA Exhibit N-75 (trial Exhibit 147, the [S]hell [C]asing found outside Fray's house) had been entered into the National Integrated Ballistics Information Network ("NIBIN") and that there were negative results for the [S]hell [C]asing," [ECF No. 913 at 9–10]; (2) Basilici did not object to S.A. Briody's testimony regarding a lack of match between the shell casing, Rifle, Magazine and Ammunition, [<u>id.</u> at 10]; and (3) Basilici "cross examine[d] Agent Briody almost exclusively on the fact that the [S]hell [C]asing did not match the other rounds in the [M]agazine that was found outside Fray's house," [<u>id.</u>].

---

[15] Basilici also argues that no law enforcement officers testified that they heard a gunshot on May 8, and that the only law enforcement officer who apparently did hear a gunshot, Peter Ginnetty, who did not testify, was the subject of a disciplinary matter that Basilici could not explore on cross examination.  <u>See, e.g.</u>, [ECF No. 898 at 3–6].  Even if the failure to disclose Ginnetty's disciplinary matter was improper, there was ample additional evidence that the jury could have relied on to find that a gun was fired on May 8 outside the Fray House.  <u>See, e.g.</u>, [Day 5 at 28:14–29:5, 34:3–6 (Fray testifying that he was shot at); <u>id.</u> at 41:18–23 (Joseph apologizing for the shooting); <u>id.</u> at 139:22–140:2 (Otero stating "I had to hit this guy last night, I shot the whole place, I went crazy last night")].

Moreover, as explained above, in response to S.A. Golia's testimony that surveillance officers reported "that they heard what they thought was a gunshot," [Day 4 at 78:2–5], the Court instructed the jury that "that statement does not come in for the truth of the matter asserted.  So it's not to establish that a shooting happened, but he can ask the question so that he can explain why he takes another action.  So it's not for the truth, you can't find that a shooting happened based on that statement," [<u>id.</u> at 78:7–17].

Even if evidence regarding the unmatched Shell Casing was provided to Basilici in an untimely fashion, any untimeliness was not so prejudicial as to warrant a new trial for at least two reasons. First, setting aside Otero and Joseph's "admissions," [Day 5 at 41:18–23 (Joseph); id. at 139:22–140:2 (Otero)], there was additional evidence from which the jury could have found that the Fray Shooting occurred, and that Otero, Joseph and Basilici were involved, see, e.g., [id. at 27:21–29:5 (Fray testifying that a shooting occurred); id. at 135:20–137:20, 146:9–147:10 (Basilici was hiding in the woods on the night of the Fray Shooting); id. at 154:4–25 (Otero and Basilici discussing "CDs" that Sergeant Butler testified were guns)]. Second, Basilici cross-examined S.A. Briody on the fact that the Shell Casing did not match the Magazine or Ammunition, [Day 5 at 95:3–98:7], negating any possibility that the jury improperly determined that the Shell Casing was fired from the Magazine during the Fray shooting. Accordingly, the Court denies Basilici's request for a new trial based on failure to disclose evidence regarding the Shell Casing.

C.        **Prosecutorial Misconduct:  Statements in Opening and Closing Arguments**

Where a defendant raises allegations of prosecutorial misconduct, the Court must consider whether the prosecutor's action "impair[ed] an accused's constitutional rights to a fair trial." United States v. Santors-Rivera, 726 F.3d 17, 27 (1st Cir. 2013) (finding prosecutor's action of "taking a gun from the evidence table and brandishing it before the jury during rebuttal" was prosecutorial misconduct, but nonetheless affirming the conviction because the misconduct was harmless where "the evidence was so overwhelmingly on the government's side that the jury would have convicted regardless of the prosecutor's misguided demonstration"). In addition, as relevant here, "several incidents of prosecutorial misconduct, none of which would separately constitute grounds for mistrial, could have a cumulative impact on the jury sufficient

to affect the trial's outcome."  United States v. Wihbey, 75 F.3d 761, 773 (1st Cir. 1996).  In

evaluating the impact of such claims, courts

> weigh several factors in determining "whether prosecutorial misconduct has so
> poisoned the well that a new trial is required: (1) the severity of the misconduct; (2)
> the context in which it occurred; (3) whether the judge gave any curative
> instructions and the likely effect of such instructions; and (4) the strength of the
> evidence against the defendant."

United States v. Robinson, 473 F.3d 387, 398 (1st Cir. 2007) (quoting United States v. Casas,

425 F.3d 23, 38 (1st Cir. 2005)).  These factors "are meant merely to guide the court's inquiry

into whether the prosecutor's improper comments have undermined the fairness of the trial."

United States v. Carpenter, 494 F.3d 13, 23 (1st Cir. 2007).

Basilici identifies four statements in the government's opening and closing arguments

that he contends were improper and that support a new trial on the basis of prosecutorial

misconduct.  [ECF No. 898 at 6–17].

1.    Basilici "Blocked" the Assault Victim from Leaving the Assault

Basilici first argues that the following two statements in the government's closing were

not supported by the evidence:

> You also see [the Assault Victim] trying to leave.  You see [the Assault Victim]
> trying to leave several times during those 12 minutes of captured video.  When you
> watch all the videos, you'll see just how many times he tries to get away, he tried
> to get away, and how many times Otero, Joseph, Lee, and the others stop him, hold
> him, detain him and drag him back into that room.  (Played recording.)
>
> . . .  What's the point of that clip?  I said Otero and Joseph and Cartier and Lee all
> took turns at various points in the videos stomping, beating, holding, detaining,
> keeping the victim inside that apartment so that they could continue to assault him,
> threaten him, beat him, rape him.  That clip shows that in addition to all of those
> people, he blocked him, too, Anthony Basilici.  [the Assault Victim] runs out of the
> kitchen toward the door and runs right into him.  That's how the clip ends.  They
> bump into Basilici as he's holding the camera.  All of these men did every one of
> those things, kept him there, threatened him, beat him.

[Day 6 at 80:10–81:3 (emphasis added)].

Special Agent Golia has listened to those videos hundreds of times. He's heard Basilici's voice on the wire calls, he's listened to Basilici's voice on the videos from the phone extraction, he's spoken to Basilici in person, and he's identified several times on those videos where he hears Basilici speak to [the Assault Victim] or his fellow kidnappers. But <u>here's the thing -- and there's really no getting around this, ladies and gentlemen -- it does not matter. Given everything that happened on the tape, Basilici could never have said a word and the evidence of his guilt of his participation in this conspiracy would have been overwhelming. He videotaped the attack. He got duct tape to restrain the victim. He blocked the victim from leaving the apartment.</u> He stood in close proximity to all of those co-conspirators for 18 minutes as they beat and detained and tortured that man, all because Otero and everybody else in the room shouted that he was a rat.

[<u>Id.</u> at 81:21–82:14 (emphasis added)]. Basilici specifically avers that the only evidence arguably supporting these statements is the following testimony from S.A. Golia: "[y]ou see [the Assault Victim] running through the living room and bouncing off the individual holding the camera, who is wearing a white T shirt, a light skinned male with a tattoo on his forearm. Q. Do you recognize who this is? A. It's Mr. Basilici." [Day 3 at 158:13–20].

In response, the government argues that Basilici objected and received an instruction that cures any potential prejudice. [ECF No. 913 at 15]. The Court's instruction was that

[a]rguments by counsel are not evidence. [The government] quite properly asked you to draw certain inferences and certain conclusions about various things, including who was the speaker at various points in the transcript, things like that. You will be the judges of those facts. She's going to argue something different, and you'll go back to the jury room and you'll figure it out. But just because he said it doesn't make it so. Okay. He was making argument. It's up to you to determine whether the argument he made is supported by the facts in the record.

[Day 6 at 95:23–96:7].

The government's comments regarding Basilici "blocking" the Assault Victim do not support a finding of prosecutorial misconduct sufficient to warrant a new trial. The jury had the relevant videos and were able to assess S.A. Golia's testimony, as well as the government's closing, in light of those videos, as well as the Court's instruction regarding attorney argument. <u>See</u> [Day 6 at 95:23–96:7]. Moreover, there was ample additional evidence to support the jury's

Verdict, including Basilici's presence and involvement as the videographer, see [Day 3 at 155:1–24; Day 4 at 27:9–11, 114:16–24], and his decision to get tape when asked, see [Day 4 at 113:13–21]. Accordingly, the Court denies Basilici's request for a new trial based on these statements.

2.  "I Don't Know You, You Don't Know Me"

Basilici next argues that the following statement in the government's closing constitutes prosecutorial misconduct:

> [t]here is one time on the video recording where it's absolutely clear that you can hear Mr. Basilici's voice, and what he said to the victim was chilling.  [played recording]. . . .  "Don't look at me.  I don't know you and you don't know me."  [The Assault Victim] meant nothing to Anthony Basilici.  He was a threat to neutralize and then push out into the cold with a busted leg.

[ECF No. 898 at 9 (quoting Day 6 at 82:12–20)].

Basilici argues that "[a]t sidebar after the government's closing, Mr. Basilici objected, pointing out that Golia had testified that the statement was made in conversation with Cartier; it was not addressed to the victim."  [ECF No. 898 at 9].  In response to the objection, the government stated the following:

> [T]he video recording portion that we played shows three people, there's [the Assault Victim] on the floor, Cameron Cartier and Anthony Basilici, and the conversation – I don't know if counsel misunderstood it, but Cartier says to [the Assault Victim], words to the effect of, I can crack you in the head.  And then it's a different voice, Basilici's, who we've argued is Basilici, who turns to the victim and is staring as the victim stares back at him on the camera saying, "I don't know you, you don't know me."
>
> So that was I think in the transcript that we played when we played that.  And I think it's, you know, particularly in light of what I said in the closing, but we acknowledge that the tape is difficult to hear sometimes and that those were our sort of best efforts based on the review of the transcript.  I don't think that requires any further comment or action by the Court.

[Day 6 at 94:5–20].  Basilici further avers that S.A. Golia "testified that the statement was part of a dialogue between Cartier and Basilici," [ECF No. 898 at 10–11], and that if it was "directed at

Cartier," as they argue that it was, "it means that the speaker is disassociating himself from gruesome assault on the victim[,]"  [id. at 10].  On the other hand, "if directed at the victim," which they argue it was not, "those same words arguably indicate that the speaker was telling the victim not to look at him and by implication, not to identify him to anyone later."  [Id.].  By mischaracterizing the statement as directed to the victim, Basilici argues, the government prejudiced his defense because "there was nothing to suggest that Mr. Basilici tried to discourage the victim from identifying him as a participant in the assault."  [Id. at 11].

In response, the government avers that its argument to the jury that the statement was made to the Assault Victim, not Cartier, "was entirely proper, as it asked the jury to make a reasonable inference based on the facts."  [ECF No. 913 at 17].  It further states that, in the video, "[w]hile it does appear that Basilici and Cartier were engaged in a brief dialogue with one another earlier in this clip, Basilici's contested phrase was made immediately after the victim stared directly at Basilici, as captured at 1:58 in Exhibit 117," and the "argument that Basilici was telling the *victim* not to look at him was a reasonable inference fully supported by the facts." [Id. at 18 (emphasis in brief)].  Finally, the government argues that "the Court made clear that the government 'quite properly asked [the jury] to draw certain inferences and certain conclusions' but that it would be up to the jury to determine whether that inference was supported by the facts."  [Id. (quoting Day 6 at 95:23–96:7].

The government's argument that Basilici's statement was directed at the Assault Victim, [Day 6 at 82:12–20], does not support a finding of prosecutorial misconduct sufficient to warrant a new trial.  The jury had access to the video and was able to assess the challenged statement for itself, and was properly instructed to that effect.  [Id. at 95:23–96:7].  Moreover, the jury had ample evidence from which it could assess whether Basilici encouraged or discouraged the April

10 Assault.  See, e.g., [Day 3 at 155:1–24; Day 4 at 27:9–11, 113:13–21, 114:16–24].

Accordingly, the Court denies Basilici's request for a new trial based on this statement.

### 3. Statements That Basilici Went with Otero and Joseph to Shoot Fray

Basilic next argues that the government made statements in opening and closing

arguments suggesting that Basilici went with Otero and Joseph to shoot Fray, and that those

statements were not supported by the evidence.  [ECF No. 898 at 11].  Specifically, Basilici takes

issue with the following statements in the government's opening, [id.]:

- These are the defendant, Anthony Basilici's words as he talked to his partner in crime, Edwin Otero.  And he described how he avoided being arrested after they, and their other partner, Justin Joseph, shot at a drug customer who owed money for 100 grams of heroin.  [Day 2 at 47:16–20].

- [Y]ou'll hear that less than a month later, May 8, 2019, Basilici traveled with Edwin Otero and Justin Joseph to shoot at one of the drug resellers who hadn't repaid his debt.  [Id. at 55:16–19].

He similarly contests the following statements in the government's closing, [ECF No. 898 at 12]:

- Anthony Basilici is guilty of possessing a firearm in connection with a drug trafficking offense.  He, along with Joseph and Otero, had three guns in the car.  All three of them had guns on the way to 63 Lafrance to confront Fray.  [Day 6 at 88:8–11].

- Was Anthony Basilici a member of the conspiracy at the time that this possession of the firearm and the discharge at Krymeii Fray was committed?  Yes.  He drove over with Edwin Otero and Justin Joseph. He's right there.  He is still a member of the conspiracy.  [Id. at 89:20–24].

- The three of them drove over to confront Fray, who owed thousands of dollars to Otero.  You've seen the recovered gun that they had in the car.  It's enormous.  You had to have two hands to carry it.  [Id. at 90:7–10].

Specifically, Basilici argues that although "it might have been fair for the government to

argue that the phone calls on May 9 and 10 support an inference that Mr. Basilici was in

possession of a firearm at some point on May 8 or 9 in concert with Otero," the evidence only

supported a finding that "firearms were thrown out the window of a vehicle *after* the shooting;

not before it." [ECF No. 898 at 12 (emphasis in brief)].  They further aver that even if he was involved after the shooting, "the repetition of claims that are not supported by the evidence, and which misstate or exaggerate the defendant's involvement in the offense are . . .  prejudicial." [Id. at 13].

In response, the government argues, among other things, that the statements were "immaterial because the jury could have convicted Basilici even if they found he was not with Otero and Joseph on the way to the shooting, because it was clear he possessed a firearm at, and immediately after, the shooting," [ECF No. 913 at 18], and also that "the circumstantial evidence surrounding the shooting supports the inference that Basilici was in the car with Otero and Joseph as they traveled to and from the shooting," [id.].

The government's statements suggesting that Basilici was in the car with Otero and Joseph on the way to the Fray Shooting, see supra, do not a support a finding of prosecutorial misconduct that warrants a new trial.  As an initial matter, the evidence of Basilici's involvement in the Fray Shooting was sufficient for the jury to find him guilty of Count Five.  See supra. Moreover, in light of the evidence suggesting that Basilici was present with Otero and Joseph after the Fray Shooting, the jury could have reasonably drawn the inference that Basilici was with them for the full time period surrounding the incident, including the time leading up to it. See [Day 5 at 135:20–137:20, 146:9–147:10, 154:4–25, 157:7–15, 159:16–24].  Finally, the jury was properly instructed regarding the distinction between attorney argument and evidence, and was free to draw any reasonable inferences from Basilici's involvement after the shooting.  [Day 6 at 95:23–96:7 ("[a]rguments by counsel are not evidence. . . .  You will be the judges of th[e] facts.  [The attorney may] argue something different, and you'll go back to the jury room and you'll figure it out.  But just because he said it doesn't make it so.  Okay.  He was making

argument.  It's up to you to determine whether the argument he made is supported by the facts in the record.")].  Accordingly, the Court denies Basilici's request for a new trial based on these statements.

## IV.      CONCLUSION

Accordingly, for the reasons explained above, Defendant's motions for acquittal and a new trial, [ECF Nos. 862, 872], are <u>DENIED</u>.[16]

**SO ORDERED.**

July 1, 2024                                                             */s/ Allison D. Burroughs*

                                                                        ALLISON D. BURROUGHS
                                                                        U.S. DISTRICT JUDGE

---

[16] Basilici filed a motion for oral argument on the present motions, [ECF No. 935], which is <u>DENIED</u> because this Order resolves both.  In addition, Basilici filed two motions requesting that the Court resolve the present motions, [ECF Nos. 1053, 1075], which are <u>GRANTED</u> to the extent that this Order resolves both.